Cite as 2025 Ark. App. 29

# ARKANSAS COURT OF APPEALS
DIVISION IV
No. CV-23-671

| | |
|---|---|
| MARK MILES WALDRIP<br>APPELLANT/CROSS-APPELLEE<br><br>V.<br><br><br>ANGELA EASON WALDRIP<br>APPELLEE/CROSS-APPELLANT | **Opinion Delivered** January 22, 2025<br><br>APPEAL FROM THE WASHINGTON COUNTY CIRCUIT COURT<br>[NO. 72DR-21-1759]<br><br>HONORABLE CRISTI BEAUMONT, JUDGE<br><br>AFFIRMED ON DIRECT APPEAL; REVERSED AND REMANDED ON CROSS-APPEAL |

## WENDY SCHOLTENS WOOD, Judge

The parties in this divorce case, Mark Waldrip and Angela Waldrip, resolved all issues pursuant to a property-settlement agreement but asked the Washington County Circuit Court to determine and divide their interest in Razorback Foundation ("Foundation") priority points and in tickets and suites to sporting events at the University of Arkansas. The circuit court entered a divorce decree finding that the priority points, tickets, and suites are marital property and ordering that the priority points be divided in half, the suites be shared with each party paying for half the cost of the suites and receiving half the seats within the suites, and the tickets be sold at a private auction between the parties. Mark appeals from the decree, arguing that the circuit court erred in finding that the priority points, tickets, and suites are marital property subject to division. Angela cross-appeals, arguing that the circuit court erred in ordering the parties to share the suites and to purchase the tickets at a private auction. We affirm on direct appeal and reverse and remand on cross-appeal.

The parties married in 1982 and divorced in 2023. During the course of their marriage, they donated over $650,000 to the Foundation and accumulated 19,523.63 priority points in two accounts,[1] several suites, and numerous tickets.[2] The circuit court held a hearing in May 2023 to decide the issues related to the priority points, suites, and tickets. There was no dispute that they were accumulated during the marriage. Rather, the disagreement was related to the nature of the priority points, suites, and tickets and their division. At the outset of the hearing, Mark argued that the "privilege of buying Razorback tickets and the points supporting that privilege are not owned by either [party]" and that if they are property, they belong to the Foundation because it "has complete discretion to assign and parcel out these tickets." Mark argued that the circuit court should not address it and "leave it up to the Razorback Foundation." Angela argued that the points, tickets, and suites are "most definitely property" with a "tremendous value associated with them or we would not have resolved every other issue in this matter and be before the [circuit court] arguing about it."

Mark testified that he entertained clients in the suites and that he wanted to maintain the privilege of buying the suites and the tickets. He also testified that he had no objection

---

[1]One account is in the name of East Arkansas Seeds, Inc. (a company owned by the parties), and it has 19,283.72 points. The second account is in Mark's name, and it has 239.91 points.

[2]Mark testified that he thought the parties had a football suite with twenty seats and eighteen additional tickets, a baseball suite with twenty seats and eight additional tickets, a softball suite with twelve seats, and sixteen basketball tickets. There are also numerous parking passes.

to some priority points being "set off" for Angela so that she could purchase tickets. Angela testified that if the priority points were divided in half, she would pay for half of the tickets.

Billie Veteto, the Foundation's interim executive director and chief financial officer, testified that the Foundation is a 501(c)(3) nonprofit organization that fundraises for the Department of Athletics at the University of Arkansas. She stated that while the University of Arkansas sells the tickets and suites, the Foundation assigns those tickets and suites to donors. Veteto stated that the first factor considered by the Foundation is a donor's membership class, which is determined by an annual donation to the Foundation. She explained that the second factor is the number of priority points a donor has. The priority points determine the ranking of donors within their membership class, and tickets and suites are assigned to donors on the basis of their rank. Veteto testified that the parties are members of the Broyles–Matthew platinum classification—the highest classification—which has approximately two hundred members and requires a $20,000 annual donation. Mark testified that he thought the parties were ranked twentieth in their membership class.

Veteto further testified that although the Foundation does not "attribute a true dollar value" to the priority points, it keeps an accounting of the points. She stated that the person whose name is on the account "owns" the points. While the Foundation generally does not transfer or divide priority points, Veteto testified that it will do so if the owners of the points agree to transfer them to an immediate family member, if the owners die, or if the Foundation is presented with a court order in a divorce. Veteto stated that if a donor elects not to purchase any tickets or suites, the donor keeps the priority points in his or her account indefinitely.

Veteto testified that an annual donation of $20,000 entitles the donor to purchase certain tickets and suites and that once purchased, the donor has the right to repurchase them every year as long as the donor continues the annual donation. She explained that maintaining entitlement to the same tickets and suites may require a donation increase when there are new Foundation guidelines, but donors will have the same tickets and suites as long as they donate according to the new guidelines. Veteto also testified that if the priority points are divided in half, each party will have to contribute $20,000 a year to stay in the platinum class, and if they do, they will keep the same tickets and suites.[3] A priority-point summary for each account, which included donation and ticket summaries, was entered into evidence.

In the June 21, 2023 divorce decree, the circuit court made the following findings:

> 7. This Court finds no reason for an inequitable division of property.
>
> 8. This Court finds that the Razorback points are marital property because they were acquired during the marriage, and it is tangible property being the subject of ownership and has value, thus all accounts should be split in half between the parties.
>
> 9. The Court further finds the suites should be split in half, which means each party is required to split half the cost of the suites and the seats are split evenly between the parties.
>
> 10. In reference to the individual tickets, this is a much more difficult item to split because there are many tickets and who is to say which are best, better or equivalent. The Court finds that the property is not divisible without great prejudice to one or both parties; therefore, since these tickets are only available for the two parties to purchase, according to the testimony of the Razorback Foundation, the tickets are to be sold at a private sale at the Washington County Circuit Clerk's Office between the parties. Kyle Sylvester as Circuit Clerk or a representative of his office is ordered to perform and supervise the sale. The tickets will be sold in groups.

---

[3]Veteto noted that if the parties' priority points are split between them, the ability to purchase tickets in visiting venues may be affected.

4

So for example: if there are 5 seats together for baseball, those seats will all be sold together. Each party can bid on the group. The highest bid will receive that group of seats. At the end of the auction, whichever party owes more will pay the difference to the other party.

11. If either party decides to turn back in their tickets or their half of a suite, the other party is to be notified immediately and given the opportunity to purchase the tickets or pay for the rest of the suite from the University of Arkansas or Razorback Foundation.

On July 18, Mark filed a notice of appeal from the decree. Angela filed a notice of cross-appeal from the decree on August 17 following the deemed denial of her motion for reconsideration. This appeal followed.

The circuit court is given broad powers to distribute both marital and nonmarital property to achieve an equitable division, and the overriding purpose of the property-division statute is to enable the court to make a division that is fair and equitable. *Howard v. Howard*, 2024 Ark. App. 566, at 8, 701 S.W.3d 48, 53. We review division-of-marital-property cases de novo, but we will not reverse the circuit court's findings of fact unless they are clearly erroneous or against the preponderance of the evidence. *Hernandez v. Hernandez*, 371 Ark. 323, 327, 265 S.W.3d 746, 749 (2007). A finding is clearly erroneous when the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been made. *Kelly v. Kelly*, 2014 Ark. 543, at 5, 453 S.W.3d 655, 660.

I. *Direct Appeal*

A. Priority Points

Mark first contends that the circuit court erred in finding that the priority points are marital property. Marital property is "all property acquired by either spouse subsequent to

the marriage." Ark. Code Ann. § 9-12-315(b) (Repl. 2020). Mark does not dispute that the priority points were acquired during the marriage but instead contends that they are not property. He claims that the priority points do not fall within the definition of property set forth in *Black's Law Dictionary* (12th ed. 2024), which is a "bundle of rights" that includes the "right to possess and use, the right to exclude, and the right to transfer." He argues that the priority points do not bestow upon the donor any such rights and that the Foundation retains the ability to unilaterally modify or retract the rights that flow from the priority points, and as a result, they are not property subject to division.

For support, Mark cites two bankruptcy cases from other jurisdictions where courts held that the opportunity to renew season tickets for professional sports teams was not a property interest to be included in the debtor's estate. *See In re Harrell*, 73 F.3d 218 (9th Cir. 1996); *In re Liebman*, 208 B.R. 38 (Bankr. N.D. Ill. 1997). He argues that, as in those cases, the priority points are not an enforceable right because "the Foundation is under no obligation to renew the donor's tickets," and a donor's mere expectation that they will be renewed is not a property interest. These arguments are not persuasive.

First, this is a divorce case—not a bankruptcy proceeding. Second, the evidence in these bankruptcy cases showed that the opportunity to renew tickets to these professional sporting events was expressly stated to be a revocable license, and there is no such evidence in the instant case. On the contrary, Veteto testified that the parties' tickets and suites would be renewed if they each made a $20,000 annual contribution.

Mark also cites *Pelts v. Pelts*, 2017 Ark. 98, 514 S.W.3d 455, for support. In *Pelts*, the supreme court held that retirement interests may be divided in a divorce decree if they are

6

vested. "Whether a retirement interest is vested hinges on several factors, including whether the benefit "cannot be diminished by the [employer] and is not dependent upon . . . continued employment." *Id*. at 3, 514 S.W.3d at 457 (quoting *Day v. Day*, 281 Ark. 261, 264, 663 S.W.2d 719, 720 (1984)). Mark likens unvested retirement benefits, which are not marital property, to the priority points because he claims the points can be "unilaterally terminated by the Foundation," they "create no more than a mere expectancy in the donor," and they "are not property subject to division."

This argument also lacks merit. Again, Veteto testified that donors maintain the right to purchase their tickets and suites annually as long as they continue to contribute to the Foundation at the requisite level. Contrary to Mark's argument, there was no evidence presented that the Foundation could unilaterally terminate a donor's priority points or tickets and suites. At most, the Foundation may modify donation amounts within each level, and if a donor makes the modified donation, he or she maintains the right to repurchase the same tickets and suites.

The evidence established that (1) the parties contributed more than $650,000 over the course of their forty-two-year marriage to accumulate the priority points; (2) the Foundation will split and transfer the points to an immediate family member by agreement of the owners, due to death of the owners, or pursuant to a court order in a divorce case; (3) the points are held in an account with the Foundation in the names of the parties (or their business) and are subject to an accounting; (4) the points are "owned" by the person whose name is on the account; and (5) the parties keep the points even if they do not purchase tickets or suites. This is sufficient evidence of an ownership interest in the

Foundation priority points such that the circuit court did not clearly err in finding that they were marital property subject to division under section 9-12-315(b).

## B. Tickets and Suites

Mark next argues that the circuit court erred in ordering that the tickets and suites be sold at a private auction because, like the priority points, there is no enforceable right to the tickets and suites; thus, they are not marital property. We disagree. The tickets and suites are inextricably linked to the priority points. And like the priority points, the parties have accumulated multiple suites and tickets over the course of their marriage. There was testimony that the Foundation allows donors to maintain their existing suites and tickets as long as they make the required annual donation. There was also evidence that the parties can sell their tickets on a game-by-game basis. Therefore, we hold that the circuit court did not clearly err in finding that the tickets and suites are marital property subject to division.

## II. *Cross-Appeal*

In her cross-appeal, Angela challenges the circuit court's division of the suites and tickets.[4] In accordance with Arkansas Code Annotated section 9-12-315(a)(1), when a divorce decree is entered, the circuit court shall distribute all marital property one-half to each party unless it is determined that such distribution would be inequitable; if the property is not divided equally, then the circuit court must state the reasons and bases for not doing so, which should be recited in the order. *See Dixon v. Dixon*, 2023 Ark. App. 519, at 8–9, 679 S.W.3d 429, 435. The overriding purpose of section 9-12-315 is to enable the circuit

---

[4]Mark did not file a reply/cross-appellee's brief to Angela's arguments on cross-appeal.

court to make a division of property that is fair and equitable under the circumstances; mathematical precision is not required. *Id.* at 10, 679 S.W.3d at 436.

## A. Suites

Angela first contends that the circuit court clearly erred in requiring the parties to share the parties' three suites. The circuit court found that the suites should be "split in half" with each party having half the seats and bearing half the cost.

By requiring that all property be divided and distributed at the time the divorce decree is entered, section 9-12-315(a) seeks to disentangle the parties' financial affairs and free each party from the other's interference. *Farrell v. Farrell*, 2020 Ark. App. 250, at 3, 600 S.W.3d 640, 642. Angela argues that the circuit court's decision not only requires their financial affairs to remain entangled but also puts them in the position to be present in the suites together should they both want to watch games from the suites. Angela also contends that because Mark has historically managed the Foundation accounts, she would be put in a position to rely on him to share all communication related to the account. We agree that the circuit court clearly erred in ordering the parties to share the suites. They are divisible, and in failing to divide them, the parties remain financially and personally entangled, which is counter to one of the purposes of section 9-12-315(a).

## B. Tickets

Angela next contends that the circuit court erred in ordering the tickets sold at a private auction between the parties. The circuit court found that with respect to the individual tickets, they were "much more difficult . . . to split because there are many tickets and who is to say which are best, better or equivalent." The court ultimately found that the

tickets were "not divisible without great prejudice to one or both parties." While we acknowledge the unique circumstances presented here, we hold that the circuit court's finding is clearly erroneous.

Section 9-12-315(a)(1)(A) provides that at the time a divorce decree is entered, all marital property shall be distributed one-half to each party unless the court finds such a division to be inequitable. The circuit court in the instant case specifically found no reason for an unequal division of property—a finding neither party challenges in this case. There are approximately forty-two tickets at issue. They are divisible, and they are all good. Veteto testified that the parties have access to "certain ticket locations" because they are members of the platinum class, which she characterized as being "the very elite of the elite."

Moreover, ordering the parties to bid against one another for their marital property could result in an unequal distribution because the parties' business acumen is not equal.[5] *See Ballegeer v. Ballegeer*, 2019 Ark. App. 269, at 7, 577 S.W.3d 66, 71 (reversing and remanding the circuit court's order that required the wife to compete with the husband in a reverse-auction bidding process for their marital business valued at $336,000 rather than requiring the husband to buy the wife's one-half interest because the award effectively resulted in an unequal distribution of marital property).

Because we agree that the circuit court clearly erred in ordering the parties to share the suites and to purchase the tickets at a private auction, we reverse and remand for the court to divide the suites and tickets. As stated above, the circuit court is to make a division that is fair and equitable under the circumstances—mathematical precision is not required.

---

[5]Mark testified that he—not Angela—dealt with professional and business colleagues.

10

Affirmed on direct appeal; reversed and remanded on cross-appeal.

TUCKER and BROWN, JJ., agree.

*Castleberry Law Firm, PLLC*, by: *Kenneth P. "Casey" Castleberry*; and *Everett Law Firm*, by: *John C. Everet*, for appellant/cross-appellee.

*Clark Law Firm PLLC*, by: *Suzanne G. Clark* and *Payton C. Bentley*, for appellee/cross-appellant.